# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JENNIFER WIEHOFF,** *et al.*,

      **Plaintiffs,**

                             **Case No. 2:23-cv-2159**

**v.**                         **Judge Edmund A. Sargus, Jr.**

                                 **Magistrate Judge Elizabeth P. Deavers**

**SIMCHA B. BENDET,** *et al.*,

      **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Simcha B. Bendet, Adroit Children, LLC, Adroit Children OH, LLC, The Perfect Child MSO, LLC, and 37 Morse Road, LLC's Motion for Summary Judgment. (ECF No. 30.) Plaintiffs Jennifer Wiehoff, Kyle Wiehoff, and Academic and Behavioral Learning Enrichment, Ltd. responded in opposition (ECF No. 35), and Defendants replied in support of the Motion (ECF No. 38). For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 30).

## BACKGROUND

### I.   Factual Background

Plaintiffs Jennifer and Kyle Wiehoff were going to sell their company to Defendant Simcha B. Bendet, but the deal fell through. This case stems from that failed sale of the Wiehoff's business.

The Wiehoffs owned Academic and Behavioral Learning Enrichment, Ltd. ("ABLE"), a company that provided applied behavioral analysis ("ABA") services to children with autism and special needs in Ohio. (Wiehoff Dep., ECF No. 31-1, 9:9–13; 10:12–17; 11:2–13.) Ms. Wiehoff

is a licensed clinician and was the primary owner of ABLE. (*Id.* 8:21–25; 9:9-19.) In spring 2022, she wanted to sell ABLE because she was about to begin a full-time post-residency internship for her doctorate program. (*Id.* 13:9–23.)

Ms. Wiehoff knew of Defendant Simcha Bendet because he messaged her on LinkedIn a few years prior about a possible collaboration. (*Id.* 15:20–22; Bendet Dep., ECF No. 31-3, 37:20–38:4.) Mr. Bendet is an entrepreneur who owns The Perfect Child MSO, LLC ("TPC"), a parent company that manages services and payroll for other companies that provide behavioral therapy for children with special needs. (Bendet Aff., ECF No. 32, ¶¶ 3–6; Bendet Dep., 10:20–11:2.)

In April 2022, Ms. Wiehoff messaged Mr. Bendet on LinkedIn asking if he would be interested buying ABLE. (Wiehoff Dep., 15:11–16:1.) The message stated:

> Hey, Simcha, are you interested in a quick acquisition for an ABA company about to declare bankruptcy? To be upfront, the books aren't up-to-date and we are looking for a buyer who accepts this. In a previous message you said you were interested in acquiring more clients. We have a lot of clients to offer, that is our asset and we use in-home not center-based to provide quality service.

(Bendet Dep., 38:11–24.) After some discussions, Ms. Wiehoff and Mr. Bendet agreed to pursue a deal for the sale of ABLE's assets. (*Id.* 54:13–18; Bendet Aff., ¶¶ 9–10.) They initially agreed on $500,000 for ABLE's assets, which included ABLE's clients, waitlist, logo, fixtures, and social media accounts. (Bendet Dep., 48:11–14; Wiehoff Dep., 25:16–25.) Ms. Wiehoff later requested to increase the purchase price to $560,000 so she could pay her staff and Mr. Bendet agreed. (Bendet Dep., 39:19–24; Opp. Exs., ECF No. 37, PageID 826.) They also agreed that Ms. Wiehoff would "stay on" for a few months after the transaction. (Wiehoff Dep., 123:20–22; Bendet Dep., 117:22–118:8.) Ms. Wiehoff wanted a quick sale, so the parties planned to close on June 3, 2022. (Wiehoff Dep., 25:1–3.) They did not formalize their intentions in a letter of intent or execute any other documents, such as a non-compete or a non-solicit agreement. (*Id.* 18:20–

19:5; 20:15–17.)

In May 2022, the parties actively pursued the deal. Their attorneys exchanged drafts of a purchase agreement. (Bendet Aff., ¶ 13; Bendet Dep., 61:17–22.) Ms. Wiehoff provided documents and information to Mr. Bendet, and Mr. Bendet and his team conducted due diligence. (*E.g.*, Wiehoff Dep., 17:16-18:12; Bendet Dep., 35:21–36:6.)

Early in the process, Ms. Wiehoff gave Mr. Bendet access to ABLE's billing software program. (Wiehoff Dep., 17:16-18:12.) The program contained ABLE's clients and their insurance and contact information. (*Id.* 17:18–18:12.) Using this information, Mr. Bendet's team contacted ABLE's clients to conduct due diligence and verify the services the clients were receiving and their insurance. (Bendet Dep., 27:20–28:1; 35:21–36:6.) According to Mr. Bendet, communications with clients revealed some billing discrepancies where billing records did not match the services the clients actually received. (*Id.* 72:4–22; 74:4–13.)

In addition to acquiring ABLE's clients, Mr. Bendet was interested in hiring ABLE's employees. (Bendet Dep., 34:23–35:13.) Ms. Wiehoff provided him an employee roster with employees' contact information, which he used to contact the employees in order to recruit them. (Wiehoff Dep., 20:9–17; 36:16–37:2.) Mr. Bendet and his team also traveled to Columbus, Ohio in May 2022 to meet Ms. Wiehoff and some of her staff. (Bendet Dep., 63:5–8.) According to Mr. Bendet, the employees had only recently learned of the sale and did not receive the news well. (Bendet Aff., ¶ 16; Mot., PageID 339.) Ms. Wiehoff testified that her employees were upset with her for selling the business to Mr. Bendet due to his "hostile and condescending" conduct. (Wiehoff Dep., 47:20–48:5.) Some of ABLE's employees resigned from ABLE because of the sale. (*Id.* 59:10–60:6; Bendet Aff., ¶ 17.)

At some point, Mr. Bendet learned about a second company owned solely by Ms.

Wiehoff, Academic Behavior Learning Enrichment, LLC. (Bendet Aff., ¶ 23; Wiehoff Dep., 27:23–24.) Ms. Wiehoff informed him that it was a shell company that did not have any clients. (Wiehoff Dep., 41:13–17.) Ms. Wiehoff's attorney told Mr. Bendet's attorney that the second company should be excluded from the transaction. (Wiehoff Dep., 39:17–40:3.) It is unclear whether the second company was ever part of the deal. (*See id.* 40:20–22; Bendet Dep., 116:8–21.)

The diligence process revealed other information. Around this time, Molina Healthcare, one of ABLE's sources of funds, conducted a routine audit of ABLE's billing practices. (Wiehoff Dep., 32:8–15.) The audit found that Molina overpaid ABLE about $26,000 for services, which ABLE paid back. (Wiehoff Dep., 33:20–34:17.) Additionally, Mr. Bendet learned that an ABLE employee used to be a director of a separate ABA company that was barred from the Ohio Autism Scholarship Program, another of ABLE's sources of funds, in 2015. (Bendet Aff., ¶ 21.) Mr. Bendet also learned that Ms. Wiehoff's husband was investigated by the Ohio Attorney General in 2011 in relation to a concrete company that he owned. (Bendet Aff., ¶ 22.)

On June 2, 2022, the day before the deal was set to close, Ms. Wiehoff gave Mr. Bendet ABLE's social media login information and attempted to transfer ABLE's Verizon account to Mr. Bendet. (Opp. Exs., PageID 828–33.) But by the end of the day, text messages between Ms. Wiehoff and Mr. Bendet show that the deal was deteriorating. (*E.g.*, Wiehoff Dep., 41:1–17; 42:17–22; 42:5–8.)

Mr. Bendet was uneasy about the exclusion of the second company from the deal, so he requested ABLE's and the second company's tax forms and bank statements. (*Id.* 38:13–24; 42:17–23.) Ms. Wiehoff asked Mr. Bendet to sign a non-disclosure agreement before providing

4

financial documents. (*Id.* 50:14–17; Bendet Dep., 141:2–5.) According to Ms. Wiehoff, Mr. Bendet did not sign the non-disclosure agreement, so Ms. Wiehoff did not send the bank statements. (Wiehoff Dep., 49:19–22; 50:9–21.)

Mr. Bendet was also concerned about an exodus of ABLE's clients and employees. (*Id.* 56:13–17.) He heard a rumor that an ABLE employee was planning on starting a competing ABA company and taking some of ABLE's employees and clients with her. (Bendet Dep., 117:7–9.) By Mr. Bendet's approximation, ABLE had lost 30 clients and 25 percent of its staff by then. (Wiehoff Dep., 58:19–22; 60:7–10.) Mr. Bendet also shared a screenshot of a hostile text message he received from a client informing him that she did not intend to receive services from any company he owned and threatening to expose him for "committ[ing] crimes." (Wiehoff Dep., 54:24–55:18.)

Mr. Bendet messaged Ms. Wiehoff stating, "I'm going to need time to think this through. But at this point, we need to do a full forensic accounting to see how legitimate things really are. Nothing makes sense here." (Wiehoff Dep., 62:3–6.) The next day, Ms. Wiehoff sent Mr. Bendet an email stating, "I just wanted to reach out one more time regarding our deal. We have both put in tons of manpower and it seems like a misuse of time to walk away. I understand you need time to think, but staff/clients also need some direction for Monday morning." (Opp. Exs., PageID 834.) Mr. Bendet responded: "[My attorney] will be able to respond further, but nothing of what we heard seems to be true. We will delay the purchase at this time for further clarification." (*Id.*) Thirty minutes later he sent the following email to ABLE's clients:

> Good afternoon parents at ABLE. Today new information has come to light. TPC has made a decision not to acquire ABLE at this time. We may still acquire the company in the near future. I apologize for the rollercoaster.
>
> If anyone has questions or concerns, feel free to email me. Your child will continue to get services as normal unless you choose to go elsewhere. TPC will be opening

up a branch based out of Cincinnati and Columbus and will operate in Cleveland also. We will not be operating in Mansfield. If anyone has any questions about services, you can email me. If your child currently does not receive services and you wish to receive services, we are here to help you.

(*Id.* PageID 835.)

On the same day, Mr. Bendet participated in a video conference via Zoom with ABLE's clients and employees about "the continued care for ABLE's clients and accommodations for ABLE's staff." (MacLean Aff., ECF No. 51, ¶¶ 6–7.) In this meeting, Plaintiffs allege that Mr. Bendet made multiple false statements about ABLE. (ECF No. 35, PageID 777.) Excerpts of the Zoom meeting were recorded and provided to the Court by physical recording referred to here as "Recording 1" and "Recording 2." Below are some of Mr. Bendet's statements from the Recordings:

- "There has been, we're not sure exactly who, there's an investigation going on right now [inaudible], and we are letting people go that have been involved with the fraud in the company. There's been certain billing fraud, there's certain licensure fraud." (Recording 1 at 1:48-2:06.)

- "There was full-on fraud with the Autism Scholarship Program and the Medicaid Molina, which is going to push certain Medicaid Molina cases out. Whoever has been involved with the fraud, whoever has been working in cahoots with people who are billing fraudulently for services that are not occurring. We're also going to be terminating all the clients that have been billing for the Autism Scholarship Program in a fraudulent way." (*Id.* 2:19-2:42.)

- "ABLE is under audit currently from Molina Medicaid and United Healthcare for not having any documentation. We [inaudible] they are willing to waive the audit as long as we take over. So, everything should be fine on that front. However, they did specifically say data collection has to be done properly." (*Id.* 3:42-4:00.)

- "I know that the attorney general has contacted us and told us that, you know, there's an investigation ongoing. Do I know what's going on? No. Do I care to be a part of it? Absolutely not. Government is not something I care to be involved with. I care to be involved in helping families. I hope—I know certain families are going to be affected because they were in cahoots with people who are billing fraudulently." (*Id.* 4:46-5:11.)

- "I can also tell you that bank statements for the company were not reflecting money coming in from the Autism Scholarship Program. Meaning that the company was

6

billing but the money was not going there. Somebody was pocketing the money. Again, I'm not going to speak to who that was and what that is. But, part of Medicaid Molina's money also has not been going to the company, it's being pocketed on the side." (*Id.* 5:11-5:34.)

- "When I'm talking about where parents are involved, is where parents are involved that are actually seem to be a potential splitting fees with the person who's billing incorrectly and stealing the money." (Recording 2 at 1:13-1:23.)

- "The fact is we did a forensic accounting. Our accountants looked through, I mean the company that does the accounting, looked through the bank accounts. The money from the Autism Scholarship Program that's officially being billed is not hitting the company's bank accounts. But it's getting paid. So where is that money going?" (*Id.* 1:30-1:45.)

Plaintiffs assert that all of these statements are false and have harmed ABLE's and Ms. Wiehoff's reputation in the special needs community where ABLE operated. (ECF No. 35, PageID 777–78.) They also provide examples of other people repeating Mr. Bendet's statements on social media. In September 2022, in a Facebook group for parents of children with autism, a former client stated:

DO NOT... I repeat DO NOT go with ABLE. We were with them for a while and then the owner closed June 1st with no notice. She is under investigation by the AG for insurance/Medicaid fraud. HORRIBLE woman.

(Opp. Exs., PageID 836.) Another client, in a separate Facebook post, stated that she was "almost positive that [her] son's [Autism Scholarship Program] slash Molina account has been frauded." (Wiehoff Dep., 97:12–23.)

In response to Mr. Bendet pulling out of the deal, Ms. Wiehoff sent an email to clients stating that ABLE will be closed for one week to "finalize plans." (Opp. Exs., PageID 838.) Four days later, she sent another email stating that ABLE will remain closed permanently. (*Id.* PageID 837.) Around this time, Mr. Bendet sent the following email to ABLE employees:

Good afternoon RBTs and BCBAs,

At TPC, we were sorry to hear about ABLE closing business. We wanted to send out an email to notify all of you that no one should be left without a job. In this time

of uncertainty, we wanted to reach out to all of you and offer interviews for jobs throughout Ohio. Currently, TPC has 41 clients in Ohio who are brand new and ready to be serviced. TPC also has 5 new applicants for ABA therapy today.

If you are interested in applying for a job, please REPLY ALL here and we will be glad to assist you. We are hiring for start dates on June 20th or before!

(Opp. Exs., PageID 839.)

It is unclear how many of ABLE's clients and staff Defendants retained after these events.

Mr. Bendet hired at least four of ABLE's employees. (Wiehoff Dep., 82:8–12; Bendet Dep., 190:1–17.)

## II.  Procedural History

Plaintiffs filed this lawsuit in the Franklin County Court of Common Pleas against Mr. Bendet and his companies: The Perfect Child MSO, LLC; Adroit Children, LLC; Adroit Children OH, LLC; and 37 Morse Road, LLC (the "Corporate Defendants"). (ECF No. 2.) Defendants removed this lawsuit to federal court based on diversity jurisdiction. (ECF No. 1.)

Plaintiffs allege that Mr. Bendet never intended to consummate the transaction. (ECF No. 2, ¶¶ 74–75.) They assert that he falsely entered the negotiations to gain access to ABLE's confidential information and intentionally destroyed ABLE's business relationships to acquire its assets for free. (*Id.*) They bring thirteen claims against Defendants under Ohio law:

- Slander per se
- Slander
- False light
- Fraud
- Tortious interference with business relationships
- Breach of contract
- Unjust enrichment
- Promissory estoppel
- Conversion
- Misappropriation of trade secrets under the Ohio Uniform Trade Secrets Act ("OUTSA")
- Negligent misrepresentation
- Infliction of emotional distress
- Civil conspiracy

8

(ECF No. 2.)

Defendants moved for summary judgment on all claims. (Mot, ECF No. 30.) Additionally, they moved to dismiss all claims against 37 Morse Road, LLC because it is a real estate holding company that did not exist when these events occurred. (*Id.* PageID 363–64.) Plaintiffs filed an opposition (Opp., ECF No. 35) and Defendants replied (ECF No. 38).

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which it may achieve by demonstrating the non-moving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue of material fact exists if the non-moving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morr Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

9

## ANALYSIS

Defendants argue that no genuine issue of material fact exists regarding Plaintiffs' claims and move for summary judgment all of them. The parties do not dispute that Plaintiffs' claims are governed by Ohio law. (*See* Mot. & Opp.) Additionally, Defendants move to dismiss 37 Morse Road, LLC because it was formed after the events at issue occurred. (Mot., PageID 362–63.) The Court first addresses Defendants' Motion for Summary Judgment on Plaintiffs' claims.

### I. Breach of Contract, Misappropriation of Trade Secrets, Infliction of Emotional Distress, and Civil Conspiracy Claims

Plaintiffs concede that their breach of contract, misappropriation of trade secrets, infliction of emotional distress, and civil conspiracy claims "should be dismissed." (Opp., PageID 779.) Accordingly, Defendants' Motion as to Plaintiffs' breach of contract, misappropriation of trade secrets, infliction of emotional distress, and civil conspiracy claims is **GRANTED**.

Further, Defendants assert that Plaintiffs' tortious interference, unjust enrichment, promissory estoppel, and conversion claims are preempted by their misappropriation of trade secrets claim under OUTSA. (Mot., PageID 350; ECF No. 38, PageID 847.) OUTSA preempts "conflicting tort, restitutionary, and other laws [of Ohio] providing civil remedies for misappropriation of trade secrets." Ohio Rev. Code § 1333.67(A). In other words, it "prevents a plaintiff from merely restating their trade secret claims as separate tort claims." *Integrity Express Logistics, LLC v. Grgurich*, No. 1:23-cv-581, 2025 WL 905629, at *3 (S.D. Ohio Mar. 25, 2025) (McFarland, J.) (quoting *Hanneman Fam. Funeral Home & Crematorium v. Orians*, 235 N.E.3d 361, 366–67 (Ohio 2023)).

In their Motion, Defendants argue that Plaintiffs cannot prove a misappropriation of trade secrets claim because the information provided by ABLE was not a trade secret. (Mot., PageID

349.) As stated above, Plaintiffs conceded that their misappropriation of trade secrets claim should be dismissed. (Opp., PageID 779.) Because the Court dismisses Plaintiffs' misappropriation of trade secrets claim, it will not consider whether OUTSA preempts Plaintiffs' tortious interference, unjust enrichment, promissory estoppel, and conversion claims and will proceed to analyze the merits of each claim.

## II. Slander, Slander Per Se, False Light

Plaintiffs allege that Mr. Bendet intentionally destroyed Ms. Wiehoff's reputation so that he could obtain ABLE's assets for free. (Opp., PageID 769.) They bring three defamation claims against Defendants—slander, slander per se, and false light—arising out of Mr. Bendet's statements on the Recordings. (Compl., ¶¶ 85–106.)

In Ohio, the elements of defamation, whether slander or libel, are that (1) the defendant made a false statement, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff suffered an injury as a proximate result of the publication, and (5) the defendant acted with the required degree of fault. *Susan B. Anthony List v. Driehaus*, 779 F.3d 628, 632–33 (6th Cir. 2015) (quoting *Am. Chem. Soc'y v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (Ohio 2012)); *Croce v. Sanders*, 843 Fed. App'x 710, 713 (6th Cir. 2021).

There are two types of slander: per se and per quod. *Holtrey v. Wiedeman*, 2023-Ohio-2440, 221 N.E.2d 284, 296 (Ohio Ct. App. 2023) (quoting *Montgomery v. Greater Cleveland Reg'l Transit Auth.*, No. CV-18-903089, 2021-Ohio-1198, 2021 WL 1310835, at *4 (8th Dist. Ohio Ct. App. Apr. 8, 2021)). A defamatory per se statement is one that imports "an indictable offense involving moral turpitude or infamous punishment, imputes some loathsome or contagious disease that excludes one from society or tends to injure one in the person's trade or occupation." *Montgomery*, 2021 WL 1310835 at *4. Defamation per quod represents "a

statement that is innocent on its face that becomes defamatory through interpretation or innuendo." *Id.* Because Plaintiffs bring a slander and a slander per se claim, the Court construes Plaintiffs' slander claim as slander per quod.

Similar to defamation, false light is when an individual "gives publicity to a matter concerning another that places the other in a false light." *Roe v. Amazon.com*, 714 Fed. App'x 565, 568 (6th Cir. 2017) (quoting *Welling v. Weinfeld*, 866 N.E.2d 1051, 1059 (Ohio 2007)). It requires proof that (1) "the false light in which the other was placed would be highly offensive to a reasonable person" and (2) "the actor had knowledge or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Id.*

Plaintiffs contend that Mr. Bendet's allegations of fraud and investigations into ABLE are false. (Opp., PageID 778.) They assert there was no billing fraud. (*Id.*) And, while Molina Healthcare did audit ABLE's billing, Plaintiffs assert that Molina did not investigate ABLE for fraud. (*Id.*) They also state that no attorney general ever contacted Mr. Bendet's team about an investigation into ABLE. (*Id.*) Also, they aver that Mr. Bendet cannot possibly claim that bank statements did not reflect funds received from the Autism Scholarship Program because he never received ABLE's bank statements. (*Id.*)

In their Motion, Defendants raise defenses that Mr. Bendet's statements were opinion, substantially true, and protected by qualified privilege. (Mot., PageID 355.) They also argue that Plaintiffs cannot establish damages. (*Id.* PageID 360–61.) The Court addresses each defense separately.

## A. Opinion

Defendants assert that Mr. Bendet's statements alleging fraud were his opinion based on information that he learned during the due diligence process. (Mot., PageID 356–57.)

"An opinion cannot give rise to a defamation claim under Ohio law." *Croce*, 843 Fed. App'x at 713. Ohio implemented a totality-of-circumstances test to determine whether a statement constitutes an opinion in a defamation lawsuit. *Vail v. Plain Dealer Publ'g Co.*, 649 N.E.2d 182, 185 (Ohio 1995). Factors to consider are: (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared. *Id.* In Ohio, whether a statement is fact or opinion is a question of law to be decided by the court. *Scott v. News-Herald*, 496 N.E.2d 699, 705 (Ohio 1986).

Considering the totality of the circumstances, the Court concludes that Mr. Bendet's statements alleging fraud were statements of fact, not opinion. First, Mr. Bendet's words were specific and unambiguous. The Ohio Supreme Court explained that "[p]recise statements are likely to be statements of fact, whereas statements that are 'loosely definable' or 'variously interpretable' generally cannot support an action for defamation." *Wampler v. Higgins*, 2001-Ohio-1293, 752 N.E.2d 962, 978 (Ohio 2001) (quoting *Ollman v. Evans*, 750 F.2d 970, 979–80 (D.C. Cir. 1984)). Mr. Bendet stated, "[t]here's been certain billing fraud, there's certain licensure fraud" and "[t]here was full-on fraud with the Autism Scholarship Program and the Medicaid Molina." (Recording 1 at 1:48-2:06; 2:19-2:22.) Although generally, "fraud" can have many meanings, Mr. Bendet's allegations of "fraud" alleged specific types of fraud that rise to criminal conduct. That is not an opinion. *See Wampler*, 752 N.E.2d at 978 ("A classic example of a statement with a well-defined meaning is an accusation of a crime."); *Scott*, 496 N.E.2d at 706 ("[S]pecific allegations of criminal conduct . . . have been found potentially actionable.").

Additionally, taken in the context of the Zoom meeting as a whole, Mr. Bendet's statements alleging fraud cannot be interpreted as opinion when they were paired with allegations of various investigations into ABLE, including an attorney general investigation.

13

Notably, whether ABLE had committed billing and licensure fraud is verifiable through public records. Yet, Defendants have presented no records that ABLE was actually investigated or convicted of crimes involving billing or licensure fraud.

As for the broader social context, Mr. Bendet made statements alleging billing and licensure fraud to a tight-knit community of parents of children with special needs in central Ohio. Because of their experiences navigating the special-needs environment, they were uniquely positioned to understand the gravity of Mr. Bendet's statements.

Further, Mr. Bendet did not qualify his statements or imply that they were his opinion when he made them. His statements were conclusive. This is illustrated in a Recording when an individual asked, "Really?" after one of Mr. Bendet's allegations and he replied, "I mean, really." (Recording 2 at 1:48–1:51.)

Accordingly, based on the actual words and context of Mr. Bendet's statements, the Court concludes that Mr. Bendet's statements in the Zoom meeting were not opinion.

## B. Substantial Truth

In Ohio, a statement that is "substantially true," has "some truth," or is "subject to different interpretations" cannot serve as the basis for a defamation claim. *Driehaus*, 779 F.3d at 633 (quoting *Serv. Emps. Int'l Union Dist. 1199 v. Ohio Elections Comm'n*, 2004-Ohio-5662, 822 N.E.2d 424, 430 (Ohio Ct. App. 2004) and *Nat'l Medic Servs. Corp. v. E.W. Scripps Co.*, 573 N.E.2d 1148, 1150 (Ohio Ct. App. 1989)). "A defamation action may be completely defended by showing that the gist, or imputation, of the statement is substantially true, and hence, the statement is not false." *Sweitzer v. Outlet Commc'ns Inc.*, 726 N.E.2d 1084, 1090 (Ohio Ct. App. 1999) (quoting *Nat'l Medic Servs. Corp.*, 573 N.E.2d at 1150). In contrast, "a false statement [is] a statement that sets forth matters which are not true or statements without

14

grounds in truth or fact." *Driehaus*, 779 F.3d at 633.

Defendants assert that all of Mr. Bendet's statements had a gist of truth, even though they were "not perfectly accurate." (Mot., PageID 358.) The Court disagrees.

Defendants assert that Mr. Bendet's statements are substantially true because ABLE's billing records did not match the services provided and an ABLE employee was barred from the Autism Scholarship Program while employed at a different company. (*Id.*) But as discussed above, whether ABLE committed billing and licensure fraud is verifiable. There appears to be no record that ABLE has been investigated for, or charged with, crimes associated with billing or licensure fraud. And an employee's prior experience with the Autism Scholarship Program before working at ABLE, has no bearing on ABLE's relationship with the Autism Scholarship Program.

Mr. Bendet's statement that the attorney general contacted his team about an investigation into ABLE is also not true. Defendants argue that it contains a gist of truth because Ms. Wiehoff's husband's concrete company was investigated by the attorney general. (*Id.*) But Mr. Bendet's statements were specifically about ABLE. The investigation into Mr. Wiehoff's business was unrelated to ABLE and occurred over ten years before the events in this lawsuit. Thus, Mr. Bendet's statement that the attorney general was investigating ABLE has no basis in truth.

Mr. Bendet's statements about the Molina Healthcare audit are also untrue; Defendants have offered no evidence to the contrary. Molina conducted a routine audit of ABLE's billing. The audit concluded prior to Mr. Bendet's recorded statements. Thus, his assertions that Molina was investigating ABLE for "not having any documentation" and that Molina was willing to waive the audit if Mr. Bendet and his team took over are verifiably not true. (Recording 1 at

3:42-4:00.)

Accordingly, Defendants' argument that Mr. Bendet's statements are substantially true are unconvincing.

### C. Qualified Privilege

In Ohio, qualified privilege is a defense to defamation "where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." *Hahn v. Kotten*, 331 N.E.2d 713, 718 (Ohio 1975). "Qualified privilege is designed to protect publications made in good faith." *Hersh v. Grumer*, 2021-Ohio-2582, 176 N.E.3d 1135, 1147 (Ohio Ct. App. 2021) (citing *Jacobs v. Frank*, 573 N.E.2d 609, 612 (Ohio 1991)). Accordingly, the elements of qualified privilege are: (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) a publication in a proper manner and to proper parties only. *Hahn*, 331 N.E.2d at 719; *Jacobs*, 573 N.E.2d at 612.

Defendants do not attempt to show that they satisfy all the elements of qualified privilege. They only attempt to satisfy the second element by alleging that Mr. Bendet had a common interest with ABLE's employees and clients as the potential buyer of ABLE. (Mot., PageID 355, 359.) The Court disagrees. As the *former* potential buyer of ABLE, Mr. Bendet had no relationship with ABLE's clients and employees. Because Mr. Bendet was no longer purchasing ABLE, his statements cannot be viewed as furthering a common interest, but rather, furthering his own business interests.

Genuine issues of material fact also exist whether Mr. Bendet's statements were made in good faith, limited in their scope, proper in manner and location, and divulged to proper parties only.

### D.  Damages

Defendants argue that Plaintiffs cannot prove damages because Ms. Wiehoff unilaterally closed ABLE, and ABLE was on the brink of bankruptcy anyways. (Mot., PageID 360.)

In Ohio, damages are presumed in slander per se claims. *Ne. Ohio Elite Gymnastics Training Ctr., Inc. v. Osborne*, 2009-Ohio-2612, 916 N.E.2d 484, 488 (Ohio Ct. App. 2009). In contrast, slander per quod and false light claims require the plaintiff to prove special damages. *Id.*; *Dudee v. Philpot*, 2019-Ohio-3939, 133 N.E.3d 590, 606 (Ohio Ct. App. 2019). Special damages are "direct financial losses resulting from the plaintiff's impaired reputation, such as lost profits to his business." *Dudee*, 133 N.E.3d at 604.

Plaintiffs do not have to prove damages in their slander per se claim. *See Ne. Ohio Elite Gymnastics Training Ctr.*, 916 N.E.2d at 488. As for the slander per quod and false light claims, the Court finds that Plaintiffs have established genuine issues of material fact that Ms. Wiehoff and ABLE suffered direct financial losses in closing their business after Mr. Bendet's Zoom-meeting statements.

In conclusion, Defendants have failed to establish that no genuine issue of material fact exists as to Plaintiffs' slander, slander per se, and false light claims. Accordingly, their Motion as to those claims is **DENIED**.

## III.   Tortious Interference with Business Relationships

For their tortious interference with business relationships claim, Plaintiffs allege that Mr. Bendet's defamatory statements sabotaged Plaintiffs' relationships with their employees and clients. (Opp., PageID 785–86.)

The elements of tortious interference with business relationships in Ohio are: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference

causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Barilla v. Patella*, 760 N.E.2d 898, 904 (Ohio Ct. App. 2001) (quoting *Wolf v. McCullough-Hyde Mem'l Hosp., Inc.*, 586 N.E.2d 1204, 1208 (Ohio Ct. App. 1990)).

Defendants assert that they could not have interfered with ABLE's business relationships because Ms. Wiehoff terminated them herself when she chose to close the business. (Mot., PageID 362.) Plaintiffs counter that Mr. Bendet's actions and defamatory statements caused employees and clients to leave ABLE, leaving Ms. Wiehoff no choice but to close the business. (Opp., PageID 786.)

A genuine issue of material fact exists as to whether Mr. Bendet's actions caused the termination of ABLE's business relationships. Whether ABLE would have continued to exist and operate if Mr. Bendet had not made defamatory statements about the company is a question for the fact finder. Defendants assert that ABLE could not have continued to operate because most of ABLE's upper management resigned by then and Ms. Wiehoff could not afford to pay her employees. (Mot., PageID 360). Plaintiffs maintain that Mr. Bendet's defamatory statements ruined ABLE's reputation and caused employees and clients to leave. (Opp., PageID 786.) Accordingly, Defendants' Motion as to Plaintiffs' tortious interference with business relationships claim is **DENIED**.

## IV. Fraud & Negligent Misrepresentation

Plaintiffs bring claims of fraud and negligent misrepresentation alleging that Mr. Bendet falsely pursued the deal to induce Ms. Wiehoff to give him ABLE's confidential information. (Compl., ¶¶ 108–12; 152.)

In federal courts, fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Under the Rule, plaintiffs "must state with particularity the

circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To accomplish this, they must "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 411 (6th Cir. 2022).

The elements of fraud in Ohio are: (1) a representation, or where there is a duty to disclose, a concealment of fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the representation or concealment; and (6) an injury proximately caused by that reliance. *Williams v. Aetna Fin. Co.*, 1998-Ohio-294, 700 N.E.2d 859, 868 (Ohio 1998) (quoting *Cohen v. Lamko Inc.*, 462 N.E.2d 407, 409 (Ohio 1984)).

Similarly, the elements of negligent misrepresentation are:

> One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Abboud v. Liberty Mut. Ins. Grp., Inc.*, 711 Fed. App'x 773, 776–77 (6th Cir. 2017) (quoting *Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989)).

Plaintiffs cannot satisfy the falsity element of their fraud and negligent misrepresentation claims. Similarly, they also cannot satisfy the intent-to-mislead element of fraud. Plaintiffs have presented no genuine issue of material fact that Mr. Bendet falsely pursued the deal with the intent to renege on it. Rather, the record shows that Mr. Bendet pursued the transaction in good faith. He retained counsel to review and exchange drafts of a purchase agreement, conducted due

diligence, planned on employing Ms. Wiehoff for a period of time after the deal closed, agreed to increase the purchase price by $60,000 to help with payroll, and traveled to Columbus to meet Ms. Wiehoff and ABLE's employees. Ms. Wiehoff acknowledged Mr. Bendet's efforts in her June 3, 2022 email by stating, "We have both put in tons of manpower and it seems like a misuse of time to walk away." (Opp. Exs., PageID 834.) Further, Plaintiffs do not point to any of Mr. Bendet's conduct during the due diligence period that gave them reason to question or doubt his intentions.

In a business acquisition, the due diligence period provides the buyer an opportunity to scrutinize the business and determine whether to move forward with the purchase. Because a deal fell through does not mean that either party pursued it under false pretenses. Accordingly, Defendants' Motion as to Plaintiffs' fraud and negligent misrepresentation claims is **GRANTED**.

## V.    Promissory Estoppel

In their promissory estoppel claim, Plaintiffs allege that Mr. Bendet promised to buy ABLE's assets, Ms. Wiehoff detrimentally relied on that promise by turning over client and employee information, and Mr. Bendet breached his promise by withdrawing from the deal. (Compl., ¶¶ 136–38; Opp., PageID 783.)

Promissory estoppel provides a remedy to enforce a promise in the absence of a contract. *Pitt v. Quanta Bldg. Grp., LLC*, 2024-Ohio-2297, 246 N.E.3d 612, 617 (Ohio Ct. App. 2024). To prevail on a promissory estoppel claim, a plaintiff must demonstrate "(1) a clear and unambiguous promise; (2) reliance on the promise; (3) reliance that is both reasonable and foreseeable; and (4) injury as a result of the reliance." *Cranpark, Inc. v. Rogers Grp., Inc.*, 498 Fed. App'x 563, 570 (6th Cir. 2012) (citing *Current Source, Inc. v. Elyria City Sch. Dist.*, 2004-

Ohio-3422, 813 N.E.2d 730, 787 (Ohio Ct. App. 2004)).

      Mr. Bendet did not make a promise to buy ABLE's assets. He agreed to pursue the deal, which he did in good faith, as explained above. The nature of this type of business transaction allowed him the opportunity to determine whether he wanted to buy ABLE's assets before signing the purchase agreement. The Court cannot construe Mr. Bendet's agreement to engage in that process as a clear and unambiguous promise to buy ABLE's assets. *See Peddler's Junction, LLC v. Wash. Square, LLC*, No. 24CA7, 2025-Ohio-3054, 2025 WL 2457713, at \*7 (4th Dist. Ohio Ct. App. Aug. 1, 2025) ("[P]romissory estoppel ordinarily cannot be based on 'preliminary negotiations subject to formal approval and acceptance.'") (quoting *McCroskey v. Ohio*, 456 N.E.2d 1204, 1206 (Ohio 1983)); *Game Sci. v. Gamestation, Inc.*, No. 4:14CV-00044-JHM, 2014 WL 12726643, at \*14 (W.D. Ky. Oct. 21, 2014) ("The promissory estoppel doctrine applies primarily to gratuitous promises rather than to arms-length transactions supported by consideration."); *see also Olympic Holding Co., L.L.C. v. ACE Ltd.*, 2009-Ohio-2057, 909 N.E.2d 93, 100 (Ohio 2009) ("Until parties execute the agreement, reliance on a statement of future intent made prior to the conclusion of negotiations in a complex business transaction is unreasonable as a matter of law.") (citation modified).

      Because Plaintiffs cannot satisfy the first element of their promissory estoppel claim, Defendants' Motion as to that claim is **GRANTED**.

## VI. Unjust Enrichment

      Plaintiffs claim that they conferred a benefit on Defendants in the form of giving Mr. Bendet ABLE's client and employee contact information and Defendants unjustly retained the benefit after the deal fell through. (Compl., ¶¶ 130–32; Opp., PageID 784.)

      "The doctrine of unjust enrichment provides an equitable remedy imposed to prevent

injustice." *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 502 (6th Cir. 2003) (quoting *Giles v. Hanning*, No. 2001-P-0073, 2002-Ohio-2817, 2002 WL 1173512, at *2 (11 Dist. Ohio Ct. App. May 31, 2002). To establish unjust enrichment, Plaintiffs must prove: (1) a benefit conferred by a plaintiff upon a defendant, (2) knowledge of the benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances where it would be unjust do so. *Wuliger v. Mfrs. Life Ins. Co. (USA)*, 567 F.3d 787, 799 (6th Cir. 2009) (quoting *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)). "Recovery under unjust enrichment is designed to compensate the plaintiff for the benefit he has conferred upon another, not to compensate him for a loss suffered." *Wuliger*, 567 F.3d at 799 (quoting *Jones v. Jones*, 2008-Ohio-6069, 903 N.E.2d 329, 337 (Ohio Ct. App. 2008)).

Defendants do not dispute that Plaintiffs conferred a benefit upon the Defendants by providing them with access to ABLE's clients and employees. (*See* Mot., PageID 344–45.) Instead, they argue that it is not inequitable to retain that benefit because Plaintiffs voluntarily provided the information. (*Id.*) But the important point is that they were willing to pay, and Plaintiffs expected payment, for the information upon consummation of the transaction. *See Pawlus v. Bartug*, 673 N.E.2d 188, 191 (Ohio Ct. App. 1996) ("[E]nrichment is not considered to be unjust if a party volunteered his or her services and did not expect payment."). Plaintiffs have presented a genuine issue of material fact whether it is unjust for Defendants to retain the benefit they received from Plaintiffs without paying for it. Accordingly, Defendants' Motion as to Plaintiffs' unjust enrichment claim is **DENIED**.

### VII.     Conversion

For their conversion claim, Plaintiffs assert that "Defendants wrongfully exercised dominion" over Plaintiffs' assets. (Compl., ¶ 142.) The elements of conversion in Ohio are

22

"(1) plaintiff's ownership or right to possession of the property at the time of conversion;

(2) defendant's conversion by a wrongful act or disposition of plaintiffs property rights; and

(3) damages." *Dice v. White Family Cos.*, 2007-Ohio-5755, 878 N.E.2d 1105, 1109 (Ohio Ct.

App. 2007) (quoting *Haul Transport of VA, Inc. v. Morgan*, Case No. CA 14859, 1995 WL

328995, at *3 (2d Dist. Ohio Ct. App. June 2, 1995)).

Defendants argue that they did not wrongfully acquire ABLE's information because

Plaintiffs voluntarily provided it in the due diligence process. (Mot., PageID 347). Plaintiffs

counter that although Defendants did not wrongfully acquire the information, they wrongfully

retained it after the deal fell through. (Opp., PageID 784–85.)

"Under Ohio law, a person who rightfully secured possession of property is not held to

have converted it 'until he fail[s] to restore it upon demand, or by some act or circumstance of

his own creation.'" *C. Norris Mfg., LLC v. BRT Heavy Equip., LLC*, No. 5:14CV2797, 2016 WL

4079752, at *7 (N.D. Ohio Aug. 1, 2016) (quoting *Fid. & Deposit Co. v. Farmers & Citizens

Bank*, 52 N.E.2d 549, 550 (Ohio 1943)). Plaintiffs have established a genuine issue of material

fact of whether Defendants converted ABLE's confidential information by retaining it after the

deal fell through. Accordingly, Defendants' Motion as to Plaintiffs' conversion claim is

**DENIED**.

## VIII.    Dismissal of Corporate Defendants

Defendants' Motion for Summary Judgment asserts that 37 Morse Road, LLC should be

dismissed because it is a real-estate holding company that did not exist when the events at issue

took place. (Mot., PageID 362–63.) Plaintiffs do not address this in their Opposition. (*See* Opp.)

Accordingly, they have abandoned their claims against 37 Morse Road, LLC. *Adkins v.

Marathon Petro. Co., LP*, 105 F.4th 841, 854 (6th Cir. 2024) ("Generally, at the summary

judgment stage, the non-moving party can forfeit an argument if they fail to respond to the

moving party's arguments.") (quoting *Palma v. Johns*, 27 F.4th 419, 429 n.1 (6th Cir 2022)).

The proper procedural instrument to dismiss a party is Rule 21 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."). Accordingly, the Court **DISMISSES** 37 Morse Road, LLC as a Defendant per Rule 21.

For the first time in their Reply, Defendants also argue that the other Corporate Defendants should also be dismissed because Plaintiffs do not allege direct or vicarious liability against the Corporate Defendants. (ECF No. 38, PageID 848.) Because the Plaintiffs did not have an opportunity to address this argument, the Court declines to dismiss The Perfect Child MSO, LLC, Adroit Children, LLC, and Adroit Children OH, LLC. *See Bennet v. Bascom*, 788 Fed. App'x 318, 323 (6th Cir. 2019) ("We generally do not permit arguments to be raised for the first time in a reply brief."); *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief . . . are waived.").

## CONCLUSION

For the reasons stated in this Opinion and Order, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment. (ECF No. 30.) Summary judgment is **GRANTED** on the following claims: (1) breach of contract, (2) misappropriation of trade secrets, (3) infliction of emotional distress, (4) civil conspiracy, (5) fraud, (6) negligent misrepresentation, and (7) promissory estoppel. The following claims remain: (1) slander, (2) slander per se, (3) false light, (4) tortious interference with business relationships, (5) unjust enrichment, and (6) conversion. Additionally, 37 Morse Road, LLC is **DISMISSED with prejudice** as a Defendant. The clerk is **DIRECTED** to terminate Defendant 37 Morse Road, LLC from this case.

This case remains open.

**IT IS SO ORDERED**.


<u>**12/12/2025**</u>                                              <u>**s/Edmund A. Sargus, Jr.**</u>
**DATE**                                                    **EDMUND A. SARGUS, JR.**
                                                           **UNITED STATES DISTRICT JUDGE**